IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>RONELL MOSES,<br><br>*Defendant.* | Criminal No. 2:21-cr-160 - 1<br><br>Hon. William S. Stickman IV |

## OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Defendant Ronell Moses, Jr. ("Moses") filed a Motion to Suppress Physical Evidence and Statements ("motion") arguing that he was subjected to an illegal, warrantless search of his vehicle while it was parked in the driveway of his residence. (ECF No. 51). The Court held an evidentiary hearing on Moses's motion and supplemental briefing is now complete. After careful consideration of the record, the evidence, and the parties' arguments, the Court will deny the motion for the following reasons.

**I.   RELEVANT FACTS**[1]

On April 23, 2020, Penn Hills Police Department Officer Dustin Hess ("Officer Hess")[2] was in uniform on routine patrol in a marked police vehicle, a Ford Explorer SUV, with his

---

[1] This section encompasses the Court's findings of fact as well as its credibility determinations. When ruling on a suppression motion, the Court takes on the role of fact finder and thus "is responsible for assessing the credibility of the testifying witnesses, weighing the evidence, and reaching any 'inferences, deductions and conclusions to be drawn from the evidence.'" *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). The Court is in the best position to observe the demeanor and tone of testifying witnesses and to evaluate credibility of their testimony. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013).

1

windows rolled down, driving on Universal Road at approximately 10:30 a.m. (ECF No. 68, pp. 7-9). He has conducted hundreds, if not thousands, of traffic stops in his career. (*Id.* at 5). A black Chevrolet Impala ("Impala") passed him traveling in the opposite direction. It had extremely dark window tinting that prevented Officer Hess from seeing any occupants inside the vehicle. Officer Hess knew the tinting was a violation of the Pennsylvania Vehicle Code. Also, when the Impala passed by Officer Hess, he detected a very strong odor of burnt marijuana emanating from the vehicle.[3] (*Id.* at 9, 11, 18-19).

Officer Hess made a U-turn at the next cross street and a quarter of a mile later caught up to the Impala. (*Id.* at 12, 15-16); (Government Exhibit 1).[4] He still could not see anyone inside the vehicle due to the window tinting, but he continued to smell marijuana. (*Id.* at 18-19). It was Officer Hess's intention to conduct a traffic stop for the illegal window tint and a potential driving under the influence, but he wanted to run the Impala's registration before doing so. (*Id.* at 51, 53, 58). The Impala then made a left turn onto Hamilton Drive, a residential area, and

---

[2] Officer Hess has been a police officer for eleven years. He began his career with the West Homestead Police Department as a patrolman for two years. Thereafter, he served two years with the University of Pittsburgh Police Department. After receiving his bachelor's degree, he attended the Pennsylvania Police Academy to become a municipal police officer. (ECF No. 68, pp. 3-4). During his eight years with the Penn Hills Police Department, Officer Hess has attended numerous trainings on traffic patrol and drug interdiction, traffic stops, high-risk traffic stops, concealment of narcotics and firearms in vehicles, and officer safety as well as numerous advanced search and seizure courses. (*Id.* at 5). For the past three years, Officer Hess has been working as a task force officer for the Pennsylvania Attorney General's drug enforcement squad. His responsibilities include conducting investigations and doing proactive drug work in a uniformed capacity in a marked police vehicle. (*Id.* at 6).

[3] Because of Officer Hess's training and experience, he is familiar with the smell of marijuana and he encounters it daily in his professional duties. (*Id.* at 4, 6-7).

[4] The Court has thoroughly reviewed the footage from the police vehicle admitted as Government Exhibit 1 ("Government Exhibit 1"), Officer Hess's bodycam footage admitted as Government Exhibit 2 ("Government Exhibit 2"), and Defense Exhibit B.

activated its left turn signal and slowly turned into the driveway of 139 Hamilton Drive. (*Id.* at 16, 55, 57). Officer Hess activated his vehicle's lights seconds before the Impala turned into the driveway, but he did so after the Impala had already activated its turn signal. Officer Hess had no time to run the Impala's registration. (*Id.* at 19-20, 45-46, 55); (Government Exhibit 1). However, he was not concerned that the driver was trying to flee or avoid the police show of authority. (*Id.* at 56-57). Had the Impala not turned into the driveway, Officer Hess would have run the registration and then effectuated a traffic stop. (*Id.* at 88).

Officer Hess parked his patrol vehicle at an angle on Hamilton Drive, at the end of the driveway of 139, with the front of the vehicle parked in the driveway. (*Id.* at 23-24, 71-72); (Defense Exhibits B1 and B2); (Government Exhibit 1). The Impala pulled twenty to thirty feet into the driveway. A truck was parked between the garage door to the residence and where the Impala parked. Officer Hess ran the Impala's registration and reported to dispatch his location and a description of the vehicle. (ECF No. 68, pp. 23-24, 41, 88); (Government Exhibits 1 and 2). He learned that the Impala was registered to that address. (*Id.* at 28). Officer Hess did not know if there were individuals inside the residence. (*Id.* at 86).

As he approached the Impala on the passenger side, Officer Hess could smell marijuana. The smell became stronger after Moses rolled down the window after Officer Hess asked him to do so. Officer Hess saw a burning marijuana cigarette in the center console cup holder. (*Id.* at 26-27, 61, 69, 90-91). Moses had bloodshot eyes. (*Id.* at 31). Officer Hess asked for Moses's identification. As Moses handed Officer Hess his license, Officer Hess asked, "you got anymore weed in here?" Moses said he did. (Government Exhibit 2 at 1:20-30). Moses reached into his pocket and produced a bag of marijuana. (ECF No. 68, pp. 62, 79). It was a flat area where Moses reached, and Officer Hess was "fairly certain there wasn't a weapon where he was

3

reaching." (*Id.* at 79). After telling Moses he could not smoke marijuana and operate a vehicle, Officer Hess confirmed that Moses resided in the home of the driveway where he was parked. (*Id.* at 28-29, 72-74) (Government Exhibit 2 at 1:3-2:05). Officer Hess asked if there was anything else inside the vehicle – drugs and/or firearms – and Moses shook his head indicating that there was nothing else. (Government Exhibit 2 at 2:05-2:12). At that point, Officer Hess called dispatch to run Moses's driver's license, and asked Moses to turn the vehicle off. (ECF No. 68, pp. 70-71); (Government Exhibit 2 at 2:12-2:32). Officer Hess walked around to the driver's side and directed Moses to exit the Impala. (Government Exhibit 2 at 2:32-2:41). Dispatch confirmed Moses's address and that he had a valid driver's license. Backup arrived around the time Moses exited the Impala. (ECF No. 68, p. 74). No weapons were found during a pat-down of Moses. (*Id.*).

Moses did not provide consent to search the Impala. Officer Hess informed Moses that he would be searching the vehicle anyways based on the marijuana he observed in the vehicle, the marijuana Moses gave to Officer Hess, and the strong odor of marijuana still emanating from the vehicle. Officer Hess opened the driver's side door of the Impala. When he lifted the cover to the center console, a firearm, a Springfield 9 millimeter bearing Serial No. XD243299, was sitting on top of numerous items. (*Id.* at 30-34, 42, 75-78); (Government Exhibit 2 at 4:11-16). Dispatch ran the serial number and reported that the firearm was stolen. (ECF No. 68, p. 38); (Government Exhibit 2 at 8:02-06). Moses was placed under arrest.

Since November 2010, Moses's mother, Michelle Green-Moses ("Green-Moses"), rented the property at 139 Hamilton Drive with a lease-to-own option. (ECF No. 68, pp. 97, 99); (Defense Exhibit E). At the time of the incident, those residing in the home were Green-Moses, her husband, her two daughters, and her son–Moses. (*Id.* at 99). Green-Moses testified, "our

4

driveway is used for our vehicles." (*Id.*). Once or twice a month, Green-Moses hosted gatherings at her house. (*Id.* at 100). On nice days, these events occurred outside, in the front area (i.e., front porch, front yard, and area near the retaining wall of the driveway), due to the small interior of the home and the backyard being sloped. (*Id.* at 101-02, 117).

The mail is delivered to the mailbox at the end of the driveway and the family takes their trash cans to the street for pickup. (*Id.* at 103-04). Packages are left on the front porch or the brick retaining wall. (*Id.* at 104, 121). The front porch of the residence is secluded and shrubs block the view of the front door. (*Id.* at 114). To get to the front porch, one has to walk up three to four stairs and follow a fenced pathway that turns to the right. After that, there are eight steps up to the front porch. (*Id.* at 115). Access to the backyard of the property is blocked by a wooden fence to the right of the house and a large evergreen tree on the left side of the house. (*Id.* at 116-17, 126); (Government Exhibits 1 and 2). Green-Moses acknowledged that the back area of the residence is more secluded than the front. (ECF No. 68, p. 118). To Green-Moses, her home feels "private." (*Id.* at 105). Nevertheless, there are no signs – e.g., "no trespassing," "private property," "stay off," "vicious dog," or "keep out" – on the property. (*Id.* at 115, 124).

The parties stipulated that as of October 7, 2022, the height of the hedges along the right side of the driveway (facing the house from the street) measures 6 feet and 2 inches. The retaining wall along the left side of the driveway measures 23 to 24 inches in height and begins 25 feet and 7 inches into the driveway and continues another 18 feet and 2 inches to the beginning of the stairs. (ECF No. 68, p. 95); (Defense Exhibit F). In the front of the property, there is small row of hedges between it and the street. (ECF No. 68, p. 106); (Government Exhibits 1 and 2). Green-Moses's family is responsible for maintaining the landscaping, including the yard, lawn, shrubs, hedges, and trees. (ECF No. 68, pp. 106-08). According to

Green-Moses, the family never cut down the hedges along the right side of driveway because it was one of the reasons they liked the property and it gave them a "sense of privacy." (*Id.* at 109). However, on the other side of their property, nothing blocked their yard from their next-door neighbor's yard. (*Id.* at 111, 116, 129-31). Walking down the hill on Hamilton Drive towards their residence, the hedges obstructed the driveway. Walking up the hill on Hamilton Drive towards their residence, nothing blocked a view of the driveway other than the slight grading of the neighbor's yard. (*Id.* at 110-11).

On the date in question, the area where Moses's vehicle was parked was clearly visible from the yard of the neighbor to the left, from a vehicle approaching from the left, and from directly in front of the property on Hamilton Drive. (Government Exhibit 2 at 00:49-00:54); (Government Exhibit 1 at 00:57-01:02). Officer Hess could see through the shrubs into the neighbor's yard on the right. (ECF No. 68, p. 39). Large portions of the shrubs were not covered with greenery, and the shrubs were 6 feet tall. (*Id.* at 39); (Government Exhibits 1 and 2).

## II. ANALYSIS

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Warrantless searches of these areas are *per se* unreasonable, with a few exceptions. *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). A Fourth Amendment search occurs when the government violates a person's "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or physically intrudes on the Fourth Amendment's protected areas to gather information, *Collins v. Virginia*, ___U.S. __, 138 S. Ct. 1663, 1670 (2018) (citing *Florida v.*

*Jardines*, 569 U.S. 1, 11 (2013)); *United States v. Jones*, 565 U.S. 400, 406 (2012) (citations omitted) (collecting cases).

To invoke the Fourth Amendment's protections, a defendant challenging a search must demonstrate that he had "an actual or subjective expectation of privacy in the subject of the search or seizure" and that "this expectation of privacy is objectively justifiable under the circumstances." *Free Speech Coalition, Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 543 (3d Cir. 2012) (citations omitted). The defendant has the burden of establishing a reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.") (citation omitted); *United States v. Donahue*, 764 F.3d 293, 298 (3d Cir. 2014) (same). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011). The Court finds that the Government has met its burden in this case.

**A. The driveway area where the Impala parked is not curtilage.**

The Court will first examine whether Officer Hess violated Moses's Fourth Amendment rights by entering his private property – the front driveway of his residence. The Supreme Court of the United States has held that "when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at 6. The heightened Fourth Amendment's protection afforded to homes extends to a home's curtilage—the area "immediately surrounding and associated with the home," *Collins*, 138 S. Ct. at 1670 (internal quotation marks omitted)

7

(quoting *Jardines*, 569 U.S. at 6), and "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened," *California v. Ciraolo*, 476 U.S. 207, 213 (1986). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 307 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The question of the extent of curtilage is essentially factual. *United States v. Benish*, 5 F.3d 20, 24 (3d Cir. 1993). There are four factors relevant to the curtilage inquiry: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. The "central component of the inquiry [i]s whether the area harbors intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (citation omitted).

Moses argues that the curtilage to his home includes the entirety of his front driveway. Recently, in *Collins*, the portion of a front driveway where a motorcycle was parked and subsequently searched was found to be curtilage by the Supreme Court. There, the area was described as follows:

> the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this <u>partially enclosed section of the driveway and the house</u>. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. <u>When Officer Rhodes searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.</u>

8

*Collins*, 138 S. Ct. at 1670-71 (emphasis added).  The Supreme Court explained, "the driveway enclosure where [the officer] searched the motorcycle constitutes "an area adjacent to the home and 'to which the activity of home life extends,'" and so is properly considered curtilage [. . .]." *Id.* at 1671 (citations omitted).  It did not, however, determine whether other portions of the driveway were curtilage.  In only analyzing the partially enclosed top portion of the driveway, the Supreme Court implicitly recognized that there can be parts of the driveway that are curtilage and other parts that are not.  Here, the Court will only consider the area of the driveway where Moses parked the Impala.  It holds that the area is not curtilage.  A picture is worth a thousand words.  To aid in the Court's explanation of its holding on the issue of curtilage, the Court includes the following image, taken from Officer Hess's body camera shortly before the search on April 23, 2020:



(ECF No. 51, p. 6; Government Exhibit 2 at 00:52).

First, the Court considers the proximity of the area claimed to be curtilage to the home. The portion of the driveway where the Impala was parked was approximately twenty feet into the driveway, or two small car lengths. It was parked past the stairs to the walkway leading to the front porch. Undoubtedly, the portion of the driveway where the Impala was parked was further from the home than the secluded front porch, the enclosed walkway leading to the porch, and the truck parked directly in front of the garage door. Nonetheless, the Government does not contest the proximity factor. Therefore, the Court finds that the first factor weighs in favor of a finding that the driveway area where the Impala was parked is curtilage.

Second, the Court considers whether the area is included within an enclosure surrounding the home. No evidence was presented that the Impala was within an enclosure surrounding the home or parked in a carport. There is no physical structure in the driveway. The parties stipulated that as of October 7, 2022, the height of the hedges along the right side of the driveway (facing the house from the street) measured 6 feet and 2 inches. (ECF No. 68, p. 95; Defense Exhibit F). It is abundantly evident in Government Exhibits 1 and 2 that the shrubs were under 6 feet at the time of the incident and one could see through portions of them due to the lack of greenery. The retaining wall along the left side of the driveway measures 23 to 24 inches and begins 25 feet and 7 inches into the driveway and continues another 18 feet and 2 inches to the beginning of the stairs. (*Id.*). The Impala was parked slightly past the beginning of the stairs to the front porch of the home. The retaining wall was on the left, the hedges were on the right, and the truck was in front of the Impala. The Court rejects the defense's position that the vehicle was "sufficiently enclosed" because of where it was parked in the driveway and the nature of the landscaping. (ECF No. 73, p. 5). The Court's analysis is not altered because of the small hedges at the front of the property, the brick structure at the end of the driveway where the

family receives mail, or because the family takes their trash bins to end of the driveway for collection. The area of the driveway where the Impala was parked was readily visible from the street and from neighbors' yards. The Court finds that the Impala was not parked in an enclosure. Thus, the second factor weighs against the Court finding that the driveway area where the Impala was parked is curtilage.

Third, the Court considers the nature of the area's usage. Moses argues that the portion of the driveway at issue was an extension of his home. Yet, there were no signs (e.g., "no trespass," "keep out," "big dog," or "private property") anywhere on the property. (ECF No. 68, p. 29). A visitor approaching the front door would have to walk up the driveway, walk up three to four stairs, follow a fenced pathway that turns to the right, and then walk up eight steps to the front porch, which is secluded with shrubs blocking the area. (*Id*. at 114-15). Packages are delivered to the front door or left on the retaining wall in the driveway. The Court recognizes that activities of a home vary among people, and it understands the value of the property to Moses's mother. She was the first member of her family to own a home and it was utilized for all of their family gatherings (e.g., holidays, birthdays, celebrations, graduations), which occurred once or twice a month. (*Id*. at 100). Due to the small interior of the home and the backyard being sloped, the family typically gathered in the front lawn and the portion of the driveway by the retaining wall. The driveway was never tented for gatherings. (*Id*. at 101-02, 117, 120). On a normal basis, the driveway was used by the family to park vehicles. Green-Moses specifically testified of the driveway, "our driveway is used for our vehicles." (*Id*. at 99). In fact, on the date in question, a truck was parked between the garage door and where Moses parked the Impala. (*Id*. at 41). The front yard and driveway area were devoid of playground equipment, toys, outdoor furniture, or a grill. (*Id*. at 37). Simply because Moses's family used

11

the driveway once or twice a month to conduct large family gatherings does not transform the visible and accessible driveway into an extension of the daily intimate activities of the home. The Court finds that the third factor weighs against a finding that the driveway area where the Impala was parked is curtilage.

Fourth, the Court considers the steps taken to protect the area from observation by people passing by. Moses's property is flanked on both sides by houses. Nothing separates the front yard of Moses's property with the property on the left side. Although there are hedges to the right that might somewhat obstruct the view into the driveway and front yard,[5] the area is nonetheless clearly visible to a person standing on the public street. Moses's family could have taken steps to protect the front yard and driveway by erecting a fence, gate, or physical structure to create an enclosure. There was no such barrier to an individual entering the front yard or driveway. (ECF No. 68, p. 35). Moses's vehicle was clearly visible walking up the hill on Hamilton Drive towards the residence, from the yard of the neighbor to the left, from a vehicle approaching from the left on Hamilton, and from Hamilton Drive directly in front of the residence. Nothing about the driveway area precluded curious neighbors, members of the public, or government agents from staying off the property. Thus, the Court finds that the fourth factor weighs against a finding that the area is curtilage.

On balance, the Court holds that the portion of the driveway at issue was not intimately linked to the home and, therefore, not curtilage. Officer Hess did not enter the home's curtilage; he did not physically intrude into a constitutionally protected area.

---

[5] Moses's front yard was different from his neighbors on his side of the street in that none had bushes. (ECF No. 68, p. 60). However, there were bushes of the same height on the opposite side of the street. (*Id.* at 92). Nine houses are on Moses's side of the street, and six are on the opposite. (*Id.* at 119).

### B. The automobile exception to the warrant requirement applies.

Because Officer Hess had a lawful right of access to the Impala parked in Moses's driveway, the Court must next evaluate the search of the vehicle. The "automobile exception" allows law enforcement to search a vehicle without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *Donahue*, 764 F.3d at 300 (citation omitted); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement. ... [I]n cases where there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." (quotation marks and emphasis omitted)). The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances. *Donahue*, 764 F.3d at 301 (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). It is assessed "from the standpoint of an objectively reasonable police officer." *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) ((quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *Gates*, 462 U.S. at 238). Probable cause exists if "there was a 'fair probability that contraband or evidence of a crime' would have been found." *Donahue*, 764 F.3d at 301 (quoting *Gates*, 462 U.S. at 238)). If probable cause justifies a search under the automobile exception, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

The Court holds that Officer Hess developed probable cause to search the Impala. "It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). Officer Hess smelled the odor of marijuana emanating from the Impala on

Universal Road when it first passed him, as well as when he followed the vehicle. (ECF No. 68, pp. 9, 11, 18-19). Once the Impala parked in the driveway, Officer Hess smelled marijuana as he approached. The odor became stronger when Moses rolled down his window. This alone gave Officer Hess the necessary probable cause to conduct a search of the vehicle. But then Officer Hess saw a burning marijuana cigarette in the center console cup holder and observed that Moses had bloodshot eyes. (*Id.* at 26-27, 31, 61, 69, 90-91). When asked if he had any more marijuana in the vehicle, Moses reached into his pocket and gave Officer Hess a baggie of marijuana. (*Id.* at 62, 79). Even more so than the smell of marijuana, the burning marijuana cigarette and Moses's relinquishment of a baggie of marijuana gave Officer Hess an articulable and particularized basis to believe that the vehicle contained drugs or further evidence of a drug crime. The Court holds that the search of the vehicle was justified.[6]

### C. The good faith exception.

Since probable cause justified the search under the automobile exception, the Court need not examine whether the search would be justified under the good faith exception.[7]

---

[6] As the Court holds that Officer Hess did not physically intrude into a constitutionally protected area and that the automobile exception applies, it need not analyze whether exigent circumstances existed. Under the exigent circumstances exception to the warrant requirement, a warrant is not required when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[7] The good faith exception prevents suppression of evidence when the executing officers acted in "good faith" or "objectively reasonable reliance" on a "subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Thus, in instances where an officer acted illegally but "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment.... [the exclusionary rule] should not be applied[ ] to deter objectively reasonable law enforcement activity." *Id.* at 918-19. The exclusionary rule is only implemented when law enforcement conduct is "deliberate, reckless, or grossly negligent." *Herring v. United States*, 555 U.S. 135, 144 (2009). However, the automobile exception requires no consideration of exigency.

### III. CONCLUSION

For the foregoing reasons of law and fact, Moses's motion will be denied. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

5-12-23
Date